PENOBSCOT RAILROAD COMPANY *versus* DUMMER.

A promise in writing to take and fill a certain number of shares in a chartered company, by a subsequent organization of the company, and an acceptance of the subscription, becomes a binding contract.

No legal assessment of shares in a corporation can be made, when the number, required by the charter, is not first taken.

But its records regularly kept, without any proof to destroy their effect, are competent to show its corporators, and whether the required number of shares were taken.

Where the terms of a subscription are, that not more than five dollars shall be assessed at the *same time*, if no more is required to be *paid* at one time, it is no valid objection that other assessments were voted at the same time.

Where the terms of a subscription required, that seventy-five per centum of the estimated cost of any sections of the railroad should be subscribed for by *responsible persons*, before commencing its construction, if the subscription is obtained in good faith, assessments will be valid, although some of the subscriptions, to make up that amount, should turn out to be worthless.

No other demand for payment of assessments to maintain an action, is necessary, than that prescribed in the by-laws of the corporation.

ASSUMPSIT, to recover fifteen assessments, of five dollars each, on five shares in the capital stock of the Penobscot Railroad Company.

At the trial, before HATHAWAY, J., after the evidence was out, it was agreed that the full Court, upon report of the evidence, should enter judgment by nonsuit or default, according to law.

The cause will readily be understood from the opinion.

*E. Kent & J. H. Hilliard,* for defendants.

*I. Washburn, jr.* and *Rowe & Bartlett,* for plaintiffs.

SHEPLEY, C. J., — This suit has been commenced to recover the amount of several assessments made on five shares of the capital stock of the corporation. The general issue having been pleaded, the existence of the corporation, with capacity to sue, is thereby admitted.

The defendant subscribed for five shares in the month of March, 1851. The corporation was not organized until the following month of May. The subscribers for the stock agreed to take and fill the number of shares set against their names, in the capital stock of the Penobscot Railroad Company, upon certain conditions. Several objections are made to the maintenance of the action.

1. The first is, that there being no such corporation existing, when the agreement was made, there is no binding contract.

It amounted to a written proposal to take so many shares, and when the corporation had been organized and had accepted that proposal, a valid contract was made. When the corporation was organized, the shares subscribed for were recognized as shares of its stock and the subscribers therefor as corporators. This was sufficient to complete the contract. *Railroad* v. *Palmer,* 34 Maine, 366; *Thompson* v. *Page,* 1 Met. 565.

2. The second objection is, that the capital required by the charter was not obtained; and that no legal assessments could therefore be made. This is a valid objection, if sustained.

The additional Act, approved on August 21, 1850, required, that the capital should consist of not less than one thousand, nor more than six thousand shares. At the meeting for organization, a committee appointed for that purpose reported, that twelve hundred and ten shares had been subscribed for, stating the names of the subscribers and the number of shares, which each had agreed to take. That report was accepted by the corporation, and those persons were thereby recognized as corporators and shareholders. The defendant and most of the others appear to have been present and to have acted as stockholders.

It is still insisted, that one thousand shares had not been taken, because it appears, that the subscriptions made for Samuel Dakin and for the town of Orono were not binding. The subscription for Dakin appears to have been made by

Gideon Mayo. The corporation appears to have regarded the subscription as made by Dakin and to have chosen him as one of its directors, to which office he was not eligible, unless he was a stockholder. He appears to have accepted the trust and to have acted in that capacity, and he does not appear to have denied at any time the authority of Mayo to subscribe for him. This would seem to be a sufficient recognition of the validity of that subscription by both of the parties.

The subscription for the town of Orono appears to have been made by certain persons assuming to have authority to make it. The shares thus subscribed for appear to have been paid for in part by money of the town. There is no proof, that the subscription was not made by those duly authorized to make it. The corporation has accepted, as before stated, that subscription as valid, and has received payment in part for those shares.

When a corporation has proceeded regularly to ascertain its corporators and the owners of shares in its capital, and has entered them in its records, all parties become thereby *prima facie* entitled to the rights thus secured to them. The records are competent and sufficient evidence of them, unless proof be introduced to destroy their effect.

3. The third objection is, that the assessments were not legally made.

One reason assigned is, that Dakin, not being a stockholder, could not be legally chosen a director. Its insufficiency has been already noticed.

Another reason assigned is, that several of the assessments were made at the same time.

The subscription was made in terms, requiring that "assessments shall not exceed five dollars on each share, at one time."

It might have been an important consideration, to have no greater sum payable and called for at one time. The time when those assessments should be voted, could be of little, if of any importance. The design appearing to have

been, to protect the shareholders from the payment of more than five dollars on each share, at one time. The language should be so interpreted as to secure to them the benefits intended, without otherwise embarrassing the movements of the company.

4. Another objection is, that the corporation has not in its acts conformed to the terms of the subscription, and to the provisions of the third section of the Act of 1850. The provision is, "said company shall not engage in, nor commence the construction of any section or sections of said railway, until seventy-five per centum of the estimated cost of said section or sections shall have been subscribed for, by responsible persons."

The intention would seem to have been to allow the company to proceed, for certain purposes, with the capital to be received for one thousand shares, but to prohibit it to commence the construction of. any section of the road, unless a subscription should be obtained from responsible persons, for three-fourths of the estimated expenses, for the purpose of preventing a waste of capital upon the whole line of the road, when it might never be able to complete it. A large amount appears to have been subscribed for H. C. Seymour, by Hervey Nash, before the construction of the road was commenced. Nash testifies, that Seymour "told him a month before he subscribed, that he had agreed to subscribe for stock to the amount of $170,000, and that he told him to subscribe for him, and he did so, and that he considered him responsible for that amount."

It is however insisted, that he and another person were not responsible for the amount by them subscribed.

If the company obtained subscriptions to the amount required in good faith, from persons apparently able to pay or to procure others to pay for the shares, it could not have been the intention to render its proceedings illegal and void, if those subscriptions should finally prove to be of little value. That would have exhibited an intention to impute crime to misfortune. It is upon the apparent

condition of men and things, that business must be trans-
acted by corporations as well as by individuals, while suc-
cess may depend much upon the care exercised to ascertain
their true condition.   The testimony does not show, that
the company did not act in good faith in receiving those
subscriptions, or that it had not at that time reason to con-
clude, that payment would be made for those shares, al-
though the death of Seymour and the insolvency of his
estate may lead to the conclusion, that he was not at that
time a responsible person for that amount.

The provision of the statute imposing this obligation up-
on the company, does not appear to have been intended to
prevent assessments upon the shares.   Money might have
been necessary for other purposes.

5. Another objection is, that no demand for payment of
the assessments was made before the suit was commenced.

The fifth section of the statute requires, that notice should
be given " as shall be prescribed by the by-laws of said cor-
poration."

The twelfth by-law prescribes the manner, in which it
should be given.

The treasurer appears to have given the notices required.
No other demand was necessary.     *Defendant defaulted.*