## Asa Low *v.* Connecticut and Passumpsic Rivers Railroad.

Where, after the charter, and before the organization, of a corporation, services are rendered which are necessary to complete that organization, and, after it has been perfected, the corporation elects to take the benefit of such services, knowing that they were rendered with the understanding that compensation was to be made, it will be held liable to pay for the services upon the ground that it must take the burthen with the benefit.

*Held* also that a suit at law will lie to recover such compensation; but that no promise to pay would be implied from the fact that such services were rendered at the request of any number of the grantees less than a majority.

*Held* also that the sole power of determining by what measures and by what agency such organization shall be effected, rests in the body of the grantees, a majority of whose votes must govern.

Where the value of the plaintiff's services in obtaining subscriptions to the capital stock and arousing public attention to the enterprise, was drawn in question, *held* that correspondence between him and others interested in the subject, was admissible as bearing upon the extent of his services, and also that evidence of his having previously conducted successfully business requiring qualifications similar to such as would be needed for the business in question was admissible.

*Held* also that parol evidence that subscriptions to stock to a large amount were solicited and obtained by him was admissible, there being no controversy that such subscriptions were made.

Evidence of the statement of the president of the corporation that the plaintiff ought to be paid for his services if any one was paid, is not admissible without showing some authority beyond the mere fact of his holding that office.

The value of horses is not a question of science, trade or skill, in this State, and, therefore, the opinion of one acquainted with the price of such property is not admissible.

In Assumpsit, under the common counts, the plaintiff, in his specification, claimed to recover for his labor and services in organizing said Railroad Company, in procuring subscriptions to its capital stock, and getting it into operation, from Jan. 1, 1845, to Jan. 15, 1846—$5.-000.00 : For one horse delivered to A. Gilmore—for services by him rendered to said Company at their request, $300.00.

Under the general issue, it appeared, that by an Act of the Legislature of Vermont, passed Nov. 10, 1835, Gardner C. Hall, and others named, of whom Erastus Fairbanks, Portus Baxter, Elijah Cleaveland and Isaac Parker were some, "with such other persons as shall associate with them for that purpose, be and hereby are constituted a body politic and corporate, by the name of the Connecticut and Passumpsic Rivers Railroad Company, with power to construct a railroad from the southern boundary of Vermont, up the valleys of the Connecticut and Passumpsic, to the north line of the State ;" the capital to be $2.000.000, and the Act to be void unless $20.000 should be expended on the road within five years.

Erastus Fairbanks, Gardner C. Hall and four others were appointed Commissioners "to open books, and receive subscriptions to the capital stock, and when subscribed, to give notice of a meeting of the stockholders, to choose directors, &c."

By an Act of Oct. 31, 1843, the corporation was revived, subject to a similar condition, and Messrs. Fairbanks, Hall and others were appointed commissioners as before.

Near the close of 1844, the Northern Railroad approaching its completion to White River, an interest was excited in the valleys of the

two rivers relative to the extension of the road to the Canada line. The Boston, Concord and Montreal Railroad had been commenced, and its projectors and favorers were anxious to extend that road up the Passumpsic Valley from Wells River, which might have rendered the building of a railroad from Wells River to White River, down the Valley of the Connecticut, somewhat uncertain.

The plaintiff was largely concerned in business in Bradford, Vt., and early engaged in the effort to awaken an interest in the enterprise of building the railroad down the Passumpsic and Connecticut valleys, to connect with the Northern Railroad at White River, or at Canaan.

The evidence tended to show that he collected maps, charts and statistics, showing the feasability of the road, and the probable amount of transportation upon it; that he was active in getting up meetings, public and private, of those interested, at various places, where the road was supposed likely to pass; at which meetings he was present, and laid before the people assembled the materials and data he had collected, and was successful in exciting a general interest and attention to the project. At some of these meetings, Mr. Low suggested to the persons present, who took the principal lead in the movement, the necessity of some person being employed steadily in visiting and stirring up the people in the different towns interested, in Vermont and New Hampshire, in visiting Boston and Canada, and inviting the attention of capitalists to the advantages of the road, and generally in forwarding the enterprise; that they all assented to the suggestion, and to the urgent need of such exertions, and suggested to Mr. Low that he was the man, and the only man who could successfully accomplish the object. Mr. Low stated his anxiety for the road, and his willingness to do what he could, consistently, with due attention to his business; but that his business was large, requiring almost his whole time, and that he could not afford to devote his time to the railroad, as it was necessary that some one should do. To which they replied that he must make it his business to push forward the road, and assured him if he would do so, he should be abundantly compensated for his services and expenses. Mr. Low testified that he always expected to be fully compensated and paid by the Railroad Company, for his time and labor and neglect of his own business, and that he devoted to this object almost all his time, from Jan. 1, 1845 till the organization of the corporation on the 15th of January, 1846.

The gentlemen who gave these assurances to Mr. Low were not corporators named in the charter, and no meeting of the corporation had been held, or associates formally admitted; but they were active favorers of the enterprise, intending to become stockholders and actually taking shares in it when the books were opened.

The evidence tended to show that Mr. Low visited Boston, and spent many weeks there, laboring to enlist the co-operation of the men of capital there; that he visited many places in the vicinity of the route, and in Canada, to unite their efforts and to encourage subscriptions. He visited Canada at the instance of gentlemen in Boston, who subsequently became stockholders, and who addressed to him a letter on the sub-

ject, which was admitted subject to the defendants' exception, and of which the following is an extract:

"BOSTON, Aug. 2, 1845.

ASA LOW, ESQ.—*Dear Sir:* The subject which you presented to our attention, of extending the line of railroads from the Concord and Lebanon road to the Connecticut River at Orford, and thence to Wells River and Canada Line, has before engaged our attention. It has our entire approbation. This we deem the most practicable route to Montreal. To secure the progress of this road, we feel disposed to aid it with our means and influence. If there is a disposition manifested on the line of the road to contribute liberally to the stock, we have no doubt that we shall be able to procure the balance of the necessary means. Please say to your friends in Canada, if they are disposed, we shall hope at no distant day to join hands and rails with them at the line," &c.

This letter was signed by 14 persons. The plaintiff, under their instructions, visited Canada, and there received a letter signed by 15 persons, stated by Mr. Low to be the leading people in the eastern townships of Canada, addressed to him, "with reference to a letter of 2nd inst., signed by Boston capitalists," saying: "We entertain no doubt the line will be promptly met by our people," &c. This was admitted subject to exception.

Mr. Low, among other services rendered, visited the commissioners in the southern part of the State, and, under their authority, procured and distributed books of subscription for stock, and in the Fall of 1845, he went to Montpelier, to urge the passage of an act to modify the charter by making two corporations, and reducing the amount of capital required for the organization of the company. The bill for this purpose was understood by its friends to be about to fail, but Mr. Low succeeded in effecting an arrangement with the friends of the Vermont Central Railroad, upon which they withdrew their opposition, and the bill passed.

While engaged in these services Mr. Low was encouraged to increased exertions, by Messrs. Fairbanks, Portus Baxter and Cleaveland, who were corporators named in the charter, and by other gentlemen not named, who were actively engaged in attending meetings and obtaining subscriptions in their own neighborhoods, and some of whom visited Boston and other places, to aid in the enterprise, and who knew generally the kind of service, and to some extent the amount of service performed by Mr. Low. Most of these gentlemen who were examined as witnesses, testified that they rendered their own services without expectation of payment, and were not aware that Mr. Low was to be paid for his services, nor did they make him any promises to that effect.

To show the capacity of the plaintiff to render the services charged, and the value of these services, the plaintiff was permitted, subject to the defendants' exception, to show the nature and extent of his business,

and its character, the amount of his yearly transactions, and the usual amount of his gains by his business.

The plaintiff testified that one day he obtained subscriptions to the stock of the road to the amount of $5.800, and that he labored in Boston till the subscriptions amounted to nearly $300.000. It was objected that this evidence was secondary, but it was admitted.

To show the character and extent of his labors the plaintiff was permitted to prove, against the defendants' objection, that, at one time while engaged in the railroad business, he became unwell in Boston, left and went to Bradford and desisted from business for a few days under medical advice.

The corporation was organized in January, 1846, and Mr. Fairbanks was elected president, and Mr. Low a director. Mr. Low presented an account to the president, who was disbursing agent of the corporation, for his expenses during the time for which his service was charged, which was allowed and paid. And at the same time he stated to the president, that he had a claim for his services, and requested that it should be settled. The president told him he would not like to allow that, without conference with the Board. He ought to be paid if any one was paid, but he was not authorized to allow the claim without consulting the Board. Objection was made to the statement that the president said he ought to be paid, &c., but it was admitted, subject to exception. Mr. Low testified that he had several interviews with the president, wishing the matter settled, and told him he would enforce the claim; but that he took counsel upon it, who discouraged a suit, and having doubts if he could maintain an action, it had lain till he knew of the recent decision of the Vermont court, and he then commenced this suit. To all this evidence the defendants excepted.

In support of his claim relating to the horse, the plaintiff testified, that, to enlist the aid of Addison Gilmore, a leading railroad man in Boston, he agreed to give him his best horse—as Gilmore should choose —whenever the cars should run into Bradford; and that he accordingly did give him such a horse, and Gilmore selected the best horse he had. He described the horse and his qualities, and said he was the best horse he knew of. He stated that he owned and bought and sold many horses, and knew the prices at which horses were sold in that vicinity, and that the best class of horses,—none, however, equal to this,—were selling there for $200.00 to $250.00. The evidence of value was admitted, subject to exception.

The court charged the jury, that, by the charter, all associates are corporators; that, by the law of Vermont, each corporator, is charged with the duty of rendering all necessary services to carry out the provisions of the charter, and to effect an organization; and that if any one performs necessary labor, and expends money in the discharge of such duty, and his action is assented to by the corporators, or, being known to them, is not objected to, and the corporation is organized, and enjoys the benefit of such services, the law implies a promise to pay for them; that every person interested in the object for which an act of incorporation is granted, and who, with the knowledge and without the objection of the corpo-

rators, and with the assent and at the request of some of them, shall unite in assisting in the organization of the corporation, with a *bona fide* intention of becoming a member, by taking stock, and shall as soon as books are opened take stock, by subscribing for shares, is to be deemed an associate from the commencement of his labors, within the purview of the act of incorporation in this case, so far as the liability of the corporation for his services is concerned ; that, in this case, if some few of the corporators mentioned in the charter requested the plaintiff to perform the services now in suit, or if the greater number of those, who like himself became associates, and in the manner that he did by subscribing for stock in the road, and becoming members of the corporation, either requested the plaintiff to render such services, or knew of them and assented thereto, he will be deemed to have sufficient authority to render the services, and the law will raise a promise of the corporation to pay for said service if necessary and reasonable. · To these instructions the defendants excepted.

The defendants requested the court to instruct the jury, that, prior to the organization, no person or persons were competent to bind the corporation by contract, express or implied ; that, prior to the organization, it would require the concurrence of a majority of the corporators named in the charter to bind the corporation by contract ; that no subscription for stock could make the subscribers associates within the meaning of the charter before organization ; that no intention to subscribe for stock, nor any acts done in furtherance of the objects of the enterprise could have that effect ; that no one would become an associate within meaning of the charter except after the organization, by being a subscriber for stock ; that the corporation could be bound by no implied contract arising before organization ; that the plaintiff is not entitled to recover anything on account of the horse delivered by him to Addison Gilmore, nor for service performed at Montpelier in procuring a division of the charter, being of the kind called "log-rolling" ; and that there is no evidence of any demand made prior to the commencement of the suit. The court declined to give these instructions as requested, and the defendants excepted.

But the court did instruct the jury that the corporation would be bound to pay for the horse delivered to Gilmore, if they found, upon consideration of all the evidence, and the nature of his employment, that Low was authorized to make such a contract in behalf of the corporation, and did so make it, and not otherwise ; that if the talk between Low and Fairbanks was understood by them to be the making a claim against the corporation, and a request that it should be allowed and paid, it was a sufficient demand.

The counsel for the defendants further requested the court to charge, that, although the plaintiff might have expected to receive compensation for his services when he performed them, yet he would not be entitled to recover, unless some one or more individuals, having authority to bind the corporation, either expected that the plaintiff was to have compensation, or so conducted as to justify plaintiff's expectation of com-

pensation, which the court regarded as embraced in the instructions before stated, and did not give, and the defendants excepted.

It was agreed that the court refer to the Vermont Reports for the Laws of Vermont on this subject, and to the charter of the Railroad.

The jury returned a verdict for the plaintiff, which the defendants move may be set aside by reason of the preceding exceptions.

*Omesby & Bingham*, for plaintiff.

*Hibbard & Felton*, for defendant.

BELLOWS, J.   The great question is whether the plaintiff is entitled to recover of the corporation in any form for services rendered by him antecedent to its organization, but which were necessary to enable it to complete that organization; and if so whether the action of assumpsit can be maintained.

In considering the first question it will be assumed for the present that the services were necessary, that they were rendered at the request of one or more of the original corporators, or of those who were associated with them, and that the corporation accepted those services after its organization, and enjoyed the benefit of them.   Under such circumstances, we are inclined to the opinion that it would become the duty of the corporation to pay for such services; and that in some form this duty could be enforced.

Questions of a similar character have repeatedly arisen in England where the projectors or promoters of railway enterprises, who were about to solicit acts of incorporation, had agreed with the proprietors of land over which such railways were destined to pass, and who were prepared to oppose such acts of incorporation, to pay certain sums of money for the land to be taken, and for residential damages, in consideration that they should withdraw their opposition.   In such cases where opposition was so withdrawn, and the charters obtained, and the companies organized, it has been repeatedly held that a duty was imposed upon the corporation to perform the contract of the projectors, upon the principle, it would seem, that a corporation is in equity bound by the contracts of its projectors preliminary to its incorporation when it afterwards takes the benefit of such contract.   In *Preston* v. *Liverpool, Manchester & Newcastle upon Tyne Railway Co.* 7 Eng. Law & Eq. 124, the Vice Chancellor lays down the doctrine thus:   "Where the projectors of a company enter into contracts in behalf of a body not existing at the time, but to be called into existence afterwards, then if the body for whom the projectors assumed to act, does come into existence, it cannot take the benefit of the contract without performing that part of it which the projectors undertook that it should perform."

This was a case where the projectors agreed to pay the complainant £5000, for the land to be taken for the railway, and residential damages, and the plaintiff therefore assented that his land should so be taken. This agreement was in writing between the plaintiff and the executive directors of the Lancashire & North Yorkshire Railway Company, which

was afterwards united with another and rival enterprise, under the name of the defendant corporation, and the two companies agreed to adopt the contract with the plaintiff.    Upon a bill in equity the court held that the plaintiff was entitled to relief against the defendants, although the construction of the contract was referred to a court of law, for an opinion.

The same general doctrine is recognized in *Gooday* v. *Colchester & Stour Valley Railway Company*, 15 Eng. Law & Eq. 596; so is *Edwards* v. *Grand Junction Railway*, 1 Mylne & Cr. 650; and *Stanley* v. *Chester & Birkenhead Railway Company*, 9 Simons, 264; affirmed by the Chancellor in 3 Mylne & Cr. 793.   These cases are all suits in equity and the doctrine of these is recognized in Redfield on Railways, 638, sec. 5; and some of them quoted and considered in sec. 7, p. 641, and *seq.*

In the application of this doctrine to cases of agreements to pay money in consideration of withdrawing opposition to a charter, there might be serious objections, as suggested by Judge Redfield in sec. 15 of his work on railways, as being contrary to public policy; but in respect to agreements not open to such objections,—that is agreements that would bind parties in existence and capable of contracting,—we think the principle is sound and well sustained by authority. If, then, this be a sound principle in respect to agreements made before the corporate existence, commenced, it must surely apply with increased force, to agreements made after the charter, and before the organization, of the corporation.

Indeed, in the American courts, agreements made with corporations after their charter, but before organization, such as agreements to take and pay for shares in the capital stock, have been repeatedly enforced, and even by suits at law.   Such are the cases of *Chester Glass Company* v. *Dewey*, 16 Mass. 94, and *Salem Mill Dam Company* v. *Ropes*, 6 Pick. 23, where subscribers for stock before organization were held liable for assessments to pay preliminary expenses incurred in obtaining the act of incorporation, and ascertaining the practicability of the enterprise; but not for the general objects of the corporation until all the shares were subscribed for.   So is *Kennebec & Portland R. R.* v. *Palmer*, 34 Maine Rep. 365; and *Penobscot Railroad Company* v. *Dummer*, 40 Maine Rep. 172.   The same principle is recognized in *Phillips Limerick Academy* v. *Davis*, 11 Mass. 116, and *Wallindford Manufacturing Company* v. *Fox*, 12 Vt. 304; *Greaves* v. *Turnpike Company*, 1 Sneed's Tenn. Rep. 491; *Lake Ontario R. R. Company* v. *Mason*, 16 N. Y. (2 Smith,) 451; *Tonica &c. R. R. Company* v. *McNeeley*, 21 Ill. 71; *Vermont Central R. R.* v. *Clayes*, 21 Vt. 30; Angell & Ames on Corporations, 495, and cases cited.

These cases go upon the ground that where such subscriber is received and acts as a member of the corporation, after the organization, and as the owner of the shares agreed to be taken, he is liable on his subscription though made before the organization was effected; for, having taken the benefit of his subscription, he must also take the burthen along with it.   This, as it will be seen, is simply the converse of the doctrine

which binds the corporation by a contract made by the projectors, and of which the corporation afterwards takes the benefit. In a large proportion of cases the subscriptions for stock necessarily precede the organization of the corporation and the choice of officers, but upon the subscribers being received and acting as members, they would be bound by such subscriptions.

The question, then, arises whether a suit at law can be maintained to recover of the corporation the value of these services. As before observed, the English cases referred to are bills in equity, and the reasoning of the courts tends to exclude the idea of suits at law. See especially *Edwards* v. *Grand Junction Railway*, 1 Mylne & Cr. 650. Where, however, the charter provided that the cost of obtaining it should be paid out of the first sums subscribed, it was held that debt would lie against the corporation by an attorney who had solicited and obtained the charter, to recover for the costs, charges and expenses. *Tilson & al.* v. *Warwick Gas Light Company*, 4 B. & C. 962. See Chitty on Con. 250, and cases cited.

In the case above cited one count of the declaration was special, setting out the statute, and there were other counts for work and labor, and the court were inclined to hold that a recovery might be had on either count. In *Hall* v. *Vt. & Mass. R. Company*, 28 Vt. 401, it was decided that a suit at law against a corporation would lie to recover for the services of the plaintiff in attending various meetings of the corporation after the charter, and before the organization, he having been one of the original corporators under the charter, by which subscriptions for five thousand shares were necessary before an organization could be perfected. The court held that the duty rested upon the corporators to do whatever was required by the charter to effect that result; that, although the corporation might not be vested with full corporate powers, yet it was *in esse*, and had an inchoate existence, and the corporators had the power, and were so far the agents of the corporation as to bind them by any act which they were required to do, or which was necessary to perfect their organization under the charter; and the court held, that, under the circumstances, a promise to pay was implied. That was an action of book debt, and is an express authority, that, in Vermont, a suit at law may be maintained; and it will be observed that in the case before us the corporation was chartered by the legislature of that State, and the road there located and built.

Under these circumstances, we think that the contract must be regarded as made in Vermont, and there to be executed; and therefore, in its nature, validity and interpretation, to be governed by the laws of Vermont; while, in respect to the form of the remedy, it is to be governed by our own laws. *Dyer* v. *Hunt & al.*, 5 N. H. 401; *Stevens* v. *Norris*, 30 N. H. 466; 2 Kent's Com. 462.

It may, then, safely be assumed, that, under the laws of Vermont, the corporation is liable in some form for services necessary to perfect its organization, and which, when such organization was perfected, it accepted, and enjoyed the benefits arising therefrom. Such would be the case in respect to services in obtaining subscriptions to the capital stock,

rendered by a corporator or associate, and which subscriptions were, after the organization, accepted by the corporation. Of course, to entitle the plaintiff to recover, such services must have been necessary and reasonable, and rendered not gratuitously, but with the understanding and expectation that they were to be paid for.

The question then is whether an action at law can be sustained in New Hampshire to enforce such claim ; or whether resort can be had to equity alone. The objection to a recovery in a suit at law is purely technical, but it must nevertheless prevail if it be well founded. We are inclined to think, however, that it is no violation of settled principles to hold that a suit at law may be maintained to enforce the obligation to pay for services rendered in the manner described, and of which the corporation, after its full organization, has taken the benefit. If it were true, that, at the time the services were rendered, the corporation had no capacity to make a contract,—which is by no means clear after the charter has been accepted,—still if the services were rendered for the corporation upon the promise of the corporators that they should be paid for by it when its organization was perfected, and after *that* the corporation had adopted the contract and received its benefits, we think, that, upon the maxim that a subsequent ratification is equivalent to a prior request, it may well be held that a promise to pay will be implied. Upon this principle a person may sue on a contract made in his name by one assuming to have authority, but having none in fact. So the title of an administrator will relate back to the death of the intestate, so as to entitle him to sue for the price of goods sold by one assuming to act for the administrator whoever might be afterwards appointed,—Broom's Legal Maxims, (676) and cases cited,—and still at the time of such sale there was no one in existence having capacity to make a contract as administrator. See also *Foster* v. *Bates*, 12 M. & W. 226. So, if one without authority buy goods for another, but afterwards the other receives them, this is equivalent to a previous request. 1 Wms. Saund. 264, n. 1 ; Broom's Legal Maxims, (596) ; Story on Agency, secs. 244, 250 ; *Keyser* v. *School District*, 35 N. H. 481–2.

In such cases it can avail nothing by way of defence to show that in fact the party had no capacity to make such antecedent request, or to bind himself by a contract, as, in the case of a corporation, that it was not organized at all, or imperfectly,—any more than to show that in point of fact there was no such request, or no contract made. But the promise is implied by law from the fact that the party, when it *had* capacity to contract has taken its benefits, and, therefore, must be deemed to have taken its burthens at the same time ; and he is estopped to controvert it, either by showing a want of capacity to make a contract, or that none in fact was made. Upon the same principle a person entering into a contract with a corporation in their corporate name is estopped to deny that it is duly constituted. *Dutchess Cotton M. Co.* v. *Davis*, 14 Johns. 238 ; *Congregational Society* v. *Perry*, 6 N. H. 164 ; Angell & Ames on Cor. 594. The case of an infant is in point. He has not capacity to bind himself by a contract except for necessaries ; but if after he arrives at full age he apply the goods to his use, he is bound to

pay as he had promised. So here, if the corporation, after its organiz-
ation, has elected to receive the benefit of services rendered for it prior
to such organization, the law may well imply a promise to make reason-
able compensation for them. To bind the corporation, however, by such
ratification it would be essential that it had previous knowledge or notice
of the existence of such claim, or of the material facts upon which it is
founded ; or, at least, that it was put upon enquiry in respect to it. 2
Greenl. Evi. sec. 66, and cases; *Bell* v. *Cunningham*, 3 Pet. 81;
*Wilson* v. *School District*, 32 N. H. 128.

The case before us stands much upon the same ground as a promise
*to* the corporation before it is organized, to take and pay for shares in
its capital stock which may, when adopted after organization be enforc-
ed by suit at law. Upon these principles the instructions to the jury,
that if a corporator perform necessary labor and expend money in carry-
ing out the provisions of the charter and to effect an organization, and
this is assented to by the corporation, or being known to them is not ob-
jected to, and the corporation is organized and enjoys the benefit of such
services, the law implies a promise to pay for them, are, as we think, sub-
stantially correct. Indeed, it would be immaterial whether such services
were rendered by a corporator or another, because the subsequent ratifi-
cation is equivalent to an antecedent request; but we think that without
such ratification either express, or implied from taking the benefit of
such services, the law would raise no such promise to pay from the mere
fact that the plaintiff was requested to render them by one of the origi-
nal corporators as associates.

The grantees named in the charter are the sole members of the corpo-
ration until associates are admitted by them ; and they may, at a meeting
duly called and holden, accept the charter and choose directors and other
corporate officers. They may, indeed, proceed to discharge the duties
devolved upon the corporation by its charter without the admission of
any associates. *Hughes* v. *Parker & al.*, 19 N. H. 181; *Day & al.*
v. *Stetson*, 8 Greenl. 365; *Penobscot Boom Co.* v. *Lamson*, 16
Maine, 224. It is obvious, then, that to bind the corporation by an ac-
ceptance of the charter, or other act, the concurrence of at least a ma-
jority of the grantees or members is necessary. This is the general rule
applicable to corporations aggregate, both before and after associates are
are admitted. Angell & Ames on Cor. 3d Ed. 459, secs. 67, 70 ; 2
Kent's Com. secs. 277, 324; *St. Mary Church in Philadelphia*, 7 S. &
R. Penn. 517; *Rex* v. *Dr. Askew*, 4 Burr. 2199; *Rex* v. *Amery*,
1 T. R. 588. It follows, then, of course, that no single member or
grantee has power to bind the corporation, either before or after a full
organization is effected, unless he is in some way duly authorized to act
as its agent by a majority of the members. The duty to take the nec-
essary steps to organize the corporation rests, not upon individual mem-
bers, but on the body of the grantees, which, in its corporate capacity
has the sole power to determine what measures, and by what agents, it
shall be effected. To hold each individual grantee to be an agent of the
corporation for this purpose, and, of himself alone, empowered to bind
it, would not only lead to inextricable confusion, but it is directly con-

trary to the well established principles which govern the action of corporations.

In the case of *Hall* v. *Vt. & Mass. R. R.*, before cited, there are expressions in the opinion of the court capable of a construction contrary to the views we have here expressed; but, taken in connection with the fact of there being evidence of assent by the body of the grantees to the rendering of the services and the corporation having the benefit of them, we think the court could not have intended to hold that a promise could be implied to pay for services by one of the grantees, rendered without the assent of the others or a majority of them unless afterwards ratified by the corporation. And such, as we understand it, was the view of the judge who tried the cause before us, although, in one clause of the instructions, the condition that the corporation should have taken the benefit of the services is not repeated.

In addition to the grounds already mentioned upon which a suit at law may be sustained, it will be observed, that, by section fourth of the charter of the defendant railroad, the expenses of all surveys and examinations, "as also of the preliminary surveys already made and making, and all manner of incidental expenses relating thereto, shall be paid by said corporation." So far, then, as the services rendered by the plaintiff come within this provision, the case of *Tilson & al.* v. *Warwick Gas Light Co.* 4 B. & C. 962, before cited, is an authority in favor of his right to recover.

There are several other questions arising upon the prayer for instructions, but, as the verdict is to be set aside upon other grounds, the views already expressed make it unnecessary now to consider them.

We shall proceed now to examine the questions in relation to the admission of evidence; and first as to the correspondence with Boston and Canada gentlemen. As bearing upon the extent of the plaintiff's labors this correspondence was admissible, as tending to show that he had procured from these persons some assurances of favor to the enterprise; and it might also bear legitimately upon the question of knowledge in the stockholders, (if that became material,) of the services rendered by the plaintiff. It being, then, admissible for these purposes, it is unnecessary to enquire, in the present aspects of the case, as to its bearing upon other questions; it being presumed, in the absence of exceptions, that proper instructions were given.

To the proof offered of the plaintiff's capacity for such business we can see no objection; for upon that, to some extent at least, the value of those services must depend. It is indeed nothing more than the ordinary case of showing that a party is an experienced workman, that the value of his services may be the better estimated. To show, then, that he was accustomed to conduct successfully a large business requiring qualities needed for the business in question, would be likely to aid the jury in estimating the value of his services.

The evidence that the plaintiff labored in Boston until the subscriptions amounted to nearly $300,000, and that he himself obtained subscriptions in one day to the amount of $5,800, might in one aspect of the case be admissible, and in another it would not be. If the fact of

such subscriptions to stock were in controversy, then the books should be produced or accounted for, as being the primary evidence on that point, and the fact could not be proved in this indirect manner. If, however, in the absence of controversy as to the fact of such subscriptions, the evidence was offered to show that the plaintiff himself solicited and obtained them, as might fairly be understood from the case, we think the evidence was admissible. Indeed, this proof could be made in no other way, as the books would not naturally show by whom the subscriptions were obtained.

We think also, that it was competent for him to prove that his labors in Boston were interrupted by illness which caused him to return home and desist from business for a few days ; as this fact would necessarily occasion the expense of another journey to Boston which it would be proper for the jury to consider.

The opinion of the president that the plaintiff ought to be paid for his services if any one was paid, we are inclined to think was not admissible. It is not a promise of one authorized to bind the corporation, nor an admission of one authorized to speak for it,—at least no such authority appears,—and for aught we can see it stands as the opinion merely of an officer of the corporation. See *Despatch Line of Packets* v *Bellamy Man. Co.* 12 N. H. 205.

Another question is, as to the opinion of the witness touching the value of a horse in question, it appearing that he had bought and sold many horses and knew the prices at which they were sold in that vicinity. Under these circumstances he was allowed to testify that the best class of horses,—none, however, equal to the one in question,—were selling there for $200 to $250. If this be regarded as a statement of sales of horses within the knowledge of the witness, it might perhaps be admissible as tending to show the market price, and the question would then arise in what manner should the quality of such horses be shown ; whether by describing them ; by stating that they were of the first quality or class ; or comparing them with the horse in question. It is obvious that the last two methods have been adopted here, and the witness has been allowed to state that those horses were of the first class or quality, but not so good as the one in question. This is clearly, we think, a matter of opinion founded upon a comparison of the various qualities of those horses, such as size, spirit, strength, speed, bottom, age, color, beauty, soundness, temper, and training for both harness and saddle, with horses in general, and with the horse in question, in particular, and from the description of which the jury would be very competent to form an opinion for themselves ; and it is in no sense like the question of the seaworthiness of a ship, or other matter of skill or science. It is, in short, but another mode of giving an opinion as to value, by stating that such horses, or rather inferior ones, were selling in market at a certain price, instead of stating directly what his market value was ; but we think the same objection lies in both cases, namely, that the opinion of the witness is given, instead of the facts from which the jury are to form an opinion.

It may be urged that the statement of the qualities of the horse, as

size, weight, speed, &c., is matter of opinion also; and if it were so its admissibility would be an exception to the general rule which excludes opinions. The truth is, there are and must be received as evidence, many statements which depend upon estimates or opinion as to size, weight, distance, speed, identity, sound, and the like. But these are received of necessity, otherwise it would often happen that no testimony could be had; and besides it is received not as a mere opinion but as a statement of size, weight, distance, identity, &c., measured or ascertained by the eye which is trained to such exercises. In respect to identity no other evidence could ordinarily be had. In regard to weight and distance, more accurate evidence might be obtained by measuring or weighing, and still something must ordinarily be left to opinion or judgment in the process; as, for instance, the length of the measure, whether a two foot rule or a yard stick, the accuracy of the weighing machine, &c. It is obvious, then, that testimony of this sort is of the nature of a statement of fact although there is mingled with it necessarily matter of opinion or judgment; but it is broadly distinguishable from the statement of opinion as to value which is determined by a consideration of the various qualities of the article in question, and which may be described to a jury, whose province it is to form an opinion for themselves. That there can be no necessity for receiving such opinions is obvious from the fact that all the materials for forming an opinion for themselves would be laid before the jury, whether the opinion of witnesses were to be received or not, and, judging from ordinary experience, the mere opinion of the witnesses would afford to the jury but little aid.

These general views are fully sustained by the case of *Leighton* v. *Sargent*, 31 N. H. 119, in an able opinion by Judge Woods. That was a case of malpractice against a physician, and the defendant proposed to enquire of a physician, who was well acquainted with defendant's qualifications, whether in his opinion the defendant possessed more than the ordinary skill of members of the profession; but the enquiry was rejected and, on exceptions, the ruling was fully sustained. The judgment of the court was, that opinions are admissible only from men of science, art, or skill in some particular branch of business; but are not admissible as to matters with which a jury may be supposed to be equally well acquainted; and the court say, that, from the facts upon which the witness in that case founds his opinion, the jury can judge as well as he, such opinion not being the result of scientific knowledge; and the court hold that opinions of witnesses are only admitted in evidence from necessity, and are exceptions to the general rule.

In that case the opinion of a physician, an expert in his profession, was sought as to the comparative skill of the defendant as a surgeon; in the case before us, the opinion of one who had knowledge of horses was received to show the comparative worth or goodness of the horse in question. If, in the former case, the opinion was not a matter of science, art, or skill, as it was there expressly held, much less can it be so regarded here, where the matter may well be considered as within the knowledge of the jurors, few of whom are likely to be ignorant of what

constitutes the worth or value of horses.   It is laid down by _Doe, J.,_ in _Jones_ v. _Tucker,_ 41 N. H. 547, that "experts may give their opinions upon questions of science, skill, or trade, or others of the like kind or when the subject matter of enquiry is such that inexperienced persons are unlikely to prove capable of forming a correct judgment upon it without such assistance ; or when it so partakes of science as to require a course of previous study, in order to the attainment of a knowledge of it ; and the opinions of experts are not admissible when the enquiry is into a subject matter, the nature of which is not such as to require any peculiar habits of study in order to qualify a man to understand it."

That the question of the value of property does not come within the principle which admits the opinions of witnesses, is settled by a great weight of authority in this State.   _Rochester_ v. _Chester,_ 3 N. H. 349 ; _Peterborough_ v. _Jaffrey,_ 6 N. H. 462.   In these cases the rule was applied to land.   _Beard_ v. _Kirk,_ 11 N. H. 397 ; _Robertson_ v. _Stark,_ 15 N. H. 109.   These cases respected the value of a sled, horses, harnesses and wagons ; and in the latter, _Parker, C. J.,_ says, there is nothing in the study or ordinary observation of horses and harnesses which entitles a witness to be introduced as an expert in relation to the value of such property.   _Hoitt_ v. _Moulton,_ 21 N. H. 586. The same general doctrine is recognized in _Concord R. R._ v. _Greeley,_ 23 N. H. 237 ; _Patterson_ v. _Colebrook,_ 29 N. H. 94, confining opinions to questions of science and skill ; and so are _Spear_ v. _Richardson,_ 34 N. H. 428, and _Page_ v. _Parker,_ 40 N. H. 59.

If, then, the opinions of witnesses as to value are not directly admissible, they cannot be indirectly adduced, by stating a sale of other horses, and the prices received for them, and that the horse in question was of equal or greater value.   Instead of this, the horses should be described, and the jury left to judge for themselves.   In _Whipple_ v. _Walpole,_ 10 N. H. 130, the witness was permitted to state what horses like those in question cost in the vicinity ; but the only question decided appears to have been, that a witness may testify as to the market value of property at any particular time and place—for that is matter of fact and not of opinion—and the attention of the court was not drawn to the point, whether the comparison between the horses sold and those lost, was not matter of opinion ; nor does it appear that this point was made by counsel.   On the other hand, the rule in _Rochester_ v. _Chester,_ 3 N. H. 349, is expressly recognized.   The case of _Hackett_ v. _Railroad,_ 35 N. H. 398, might, at first, seem to go further, as it was held that a witness might state that he had sold lumber like the boards in dispute at certain prices ; but it will be observed that boards are included among the articles that are sold in market, according to surveys, as to quantity and grade, and the court say, that to judge of the qualities of lumber is, to a great extent, a matter of art and skill peculiar to those whose business renders them conversant with matters of this kind ; thus plainly distinguishing it from the cases concerning the value of land, horses, and other property which does not require any peculiar study and skill to understand its value.   This, then, is not an authority for the admission of

the testimony under consideration. Upon these views we are of the opinion that this evidence of value was not admissible.

As to the claim for the payment made to Addison Gilmore for his aid and services, it may not be necessary to investigate it fully at this time, especially as it does not appear distinctly whether any, or if any, what services were rendered by him; whether the corporation having knowledge thereof took the benefit of them; or whether the plaintiff engaged him and paid him under the authority of the corporators and their associates or a majority of them. The defendant asked the court to charge the jury that the plaintiff was not entitled to recover any thing for the horse delivered to Gilmore, which the court declined to do; and as we understand the case, the refusal so to instruct the jury was proper; it being a question of fact whether services were rendered by Gilmore and paid for by plaintiff in behalf of the corporation, and which it afterwards, with a knowledge of what had been done, adopted and took the benefit of; or whether Gilmore was so employed and paid under the authority of the corporators and their associates, or the major part of them. In either event, as in the case of services rendered by the plaintiff himself, he would be entitled to recover what he reasonably deserved to have.

It may be urged in respect to the claim for services by Mr. Gilmore, as well as those by the plaintiff himself, that they were merely gratuitous, rendered by him and many other individuals, having private interests to be advanced by the enterprise, without any agreement or expectation of pay, except the incidental benefit to be derived from the railroad. If it were so, then no power to pay would be implied from the fact of accepting and taking the benefit of the subscriptions so obtained. But whether it were so or not, is a question of fact for the jury to determine upon a consideration of all the evidence in the case; such as the extent and value of the services, the amount of time devoted to it, his communications with the corporators and their associates, requests by them to bestow those services, and assurances of compensation if any are shown; and, generally, any facts that tend to show that the services were rendered upon the understanding that they were or were not to be paid for.

With these views there must be

*A new trial.*